FILED
2015 Jan-16  AM 10:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| **WALTER ANDREWS,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **v.** ] | |
| ] | **Case No.: 1:13-cv-00835-KOB** |
| **PRYOR GIGGEY COMPANY,** ] | |
| ] | |
| **Defendant.** ] | |
| ] | |

## <u>MEMORANDUM OPINION</u>

This matter comes before the court on Defendant Pryor Giggey Company's "Motion for Summary Judgment." (Doc. 31). Plaintiff Walter Andrews sued Pryor Giggey alleging that Pryor Giggey subjected him to a racially hostile work environment, retaliated when he complained of racial harassment by terminating him, and also terminated him because of his race. (Doc. 1). Pryor Giggey asks the court to grant summary judgment on all of Andrews' claims.

The court cannot summary judgment because genuine issues of material fact exist and Pryor Giggey is not entitled to judgment as a matter of law. Taking the facts in Andrews' favor, this case is about one man's battle to have his voice heard above the daily din of racial slurs and degradation from his supervisor, who, when Andrews finally complained, engineered Andrews' firing by manipulating subordinates, superiors, and the facts.

Therefore the court **DENIES** Pryor Giggey's motion for summary judgment.

### I.    Facts

For summary judgment, the court recites the facts below in the light most favorable to

1

Andrews. They may not be the facts proved at trial.

**A.  Hiring**

Pryor Giggey manufactures refractory products. A staffing agency placed Andrews, an African American, at Pryor Giggey's Anniston factory as a temporary employee in 2009. Pryor Giggey hired Andrews permanently in June 2010. (Doc. 32, 3, ¶¶ 1-3; Doc. 38, 7-8, ¶ 1).

Andrews received an Employee Policy Handbook when he started working at Pryor Giggey. The Handbook includes an "Equal Opportunity Policy" and a "Harassment and Sexual Harassment Policy." The Equal Opportunity Policy required employees to report discrimination in writing to the "Human Resources Department." The Human Resources Department merely consisted of Preston Insley, Pryor Giggey's Chief Financial Officer who has never held an HR title. The Harassment and Sexual Harassment Policy required employees to "promptly report the facts" of a discrimination incident to their supervisor or a company officer. Pryor Giggey also accepted oral complaints of discrimination. Employees could complain to "anyone and it should follow, you know, the train up the line." (Doc. 32, 3-4, ¶¶ 5-7; Doc. 33-1, 24; Doc. 38, 6, ¶ 6).

Pryor Giggey initially assigned Andrews to wrap pallets and to assist with loading and unloading trucks in its warehouse as a Shipping and Receiving Assistant. Andrews assisted Larry Williams, an African American, who was the Lead Shipping and Receiving employee. (Doc. 32, 3, ¶ 3; Doc. 38, 8, ¶ 3).

Pryor Giggey also assigned Andrews to work in the Production area of the warehouse from time to time when Pryor Giggey manufactured certain refractory products that required additional resources to produce. Andrews was working in the Production area on the day Pryor Giggey terminated him. However, he only worked in the Production area a few days in his last

2

year at Pryor Giggey. (Doc. 38, 7, ¶ 15).

**B.      Chain of Command**

Williams reported to Jeff Woods, an African American, who was the Supervisor in the

Production area during Andrews' employment. While Andrews was Williams' helper, he also

reported directly to Woods. Keith Thomas, an African American, was the Lead Production

employee during Andrews' employment, and also reported to Woods. (Doc. 32, 3, ¶ 4; Doc. 38,

6, 8, ¶ 4, ¶ 6).

Woods reported to Shane Pressley, a Caucasian, who was the Plant Manager from

October 2010 until after Pryor Giggey terminated Andrews. Pressley could hire, fire, and

discipline employees. Pressley reported to Allen Davis, a Caucasian, who was Prior Giggey's

Vice President of Operations and Technical Director. (Doc. 32, ¶ 15; Doc. 33-1, 24; Doc. 38, 8,

¶¶ 5-6).

**C.      Harassment**

A few weeks after Prior Giggey hired Andrews, in June or July 2010, Pressley, the Plant

Manager, began using racial slurs when talking to Andrews, saying, for example, "nigger, you

got that done," and "[t]ake your black ass up there and get it." Pressley called Andrews "black

ass" many times saying, for example "we have product be done hit the ground, take your black

ass and get a shovel and shovel it up." Pressley used racial slurs "almost every other day." (Doc.

38, 8, 10, ¶ 7, ¶ 14).

In 2011, during an argument Pressley told Andrews "[s]tupid nigger, don't you know how

to wrap a pallet?" (Doc. 38, 9, ¶ 11).

In May 2012, a month before Pryor Giggey fired him, Andrews asked Pressley why he

allowed Randy Holder, a Caucasian, to take breaks without clocking out of work. Pressley told Andrews "[n]igger, don't you worry about that. I will worry about what Randy does. I'm going to fire your black ass if you keep on talking." (Doc. 38, 9, ¶ 8).

Pressley did not limit his racial slurs to Andrews, however. Chris Howard, an African American temporary employee, also heard Pressley use racial slurs towards other employees. Howard heard Pressley tell a group of African American employees before a Pryor Giggey Christmas party that "there's not going to be any fried chicken or watermelon at the party." On another occasion, Howard heard Pressley tell Holder "black people must be stupid or something. They can't even follow simple instructions." Howard heard Pressley use the phrase "black ass" to refer to African Americans daily. Woods told Howard to ignore Pressley's comments. (Doc. 38, 9, 10, ¶¶ 9, 12, 13).

### D.    Pre-Complaint Discipline

Andrews' supervisors wrote warnings and observed Andrews breaking rules several times before he complained about Pressley's harassment.

Pressley wrote warnings to Andrews on April 5 and April 11, 2011 for not working. However, Andrews never received these warnings. Pressley also gave Andrews a written warning on June 13, 2011 for failing to report to work on a Saturday though Andrews had not been told he needed to come to work that day. Also in 2011, Williams reported Andrews for using his forklift to raise Williams' forklift off the ground with Williams inside. (Doc. 32, 5, ¶¶ 9, 11; Doc. 38, 6, ¶ 9).

On January 5, 2012, Davis observed Andrews violating several Pryor Giggey rules, including standing in front of his running forklift; standing in a corner talking on his cell phone;

and improperly wrapping a pallet of bags. Davis observed Andrews away from his post on another occasion. Andrews did not receive written warnings for these incidents. (Doc. 32, ¶ 14; Doc. 38, 19, ¶¶ 69, 71).

On April 2, 2012, despite these warnings and observations, Andrews received a $0.50 per hour "merit increase" in pay. (Doc. 38, 8, ¶ 4).

### E.    Complaint

Andrews never reported any racial discrimination to Williams or Woods. Andrews did tell Woods that Pressley was "picking on him," but never mentioned any racial discrimination.[1] Woods told Andrews to talk to Davis about his complaints. Woods did not mention Andrews' complaints about Pressley to Davis, but Woods did talk to Pressley directly. (Doc. 38, 10-11, ¶¶ 17-20; Doc. 41, 3, ¶¶ 15, 17-18).

Finally, in May 2012, Andrews reported Pressley's actions to Davis. Andrews complained that Pressley degraded him and used racial slurs against him stating "I went in and Mr. Davis spoke and I told him I had a problem, a problem with Shane [Pressley] calling me the N-word." (Doc. 33-3, 6; Doc. 38, 11-12, ¶¶ 22, 25).

A few hours after Andrews met with Davis, Pressley found Andrews and said "I told your black ass it wasn't going to do no good to go and tell Allen nothing on me. Allen can't fire me" and told Andrews to "get your black so-and-so back to work." (Doc. 38, 12, ¶ 28).

### F.    Post-Complaint Discipline

Things came to a head in May 2012 after Andrews complained to Davis about Pressley.

---

[1]At his deposition, Woods corrected earlier testimony and clearly stated that Andrews complaints regarding Pressley did not involve race. (Doc. 41, 3, ¶ 17).

In early May, a customer complained when it received the wrong product and, on May 5, 2012, Andrews received a written warning from Woods for failing to properly check the truck Williams loaded for the customer. Pressley told Woods to issue the warning to Andrews. Williams, who has never complained about discrimination, did not receive a warning. Pressley told Davis about Andrews' warning on May 23, 2012, though Davis usually did not receive notice of this type of warning. (Doc. 32, 5-6, ¶ 13; Doc. 38, 17, ¶¶ 57-59, 61-62).

Also in May 2012, after being summoned by Pressley to see Davis, Thomas told Davis that, when Pryor Giggey sporadically assigned Andrews to the Production area, he refused to work when asked, refused to take instructions, and would leave his post. Thomas told Davis to "get Walt out of there." (Doc. 32, 7, ¶ 16).

That same month, Williams told Davis that he tried to avoid Andrews and would rather not work with him though Williams denies this conversation had anything to do with Andrews' job performance. (Doc. 32, 7, ¶ 17).

### G.    Termination

Before Pryor Giggey terminated Andrews, Davis reviewed Andrews' record. Andrews' record included warnings written by Pressley and by Woods at Pressley's direction. Davis also spoke with Pressley about the decision to terminate Andrews. (Doc. 38, 6, 13, ¶¶ 10, 35).

On June 1, 2012, Pryor Giggey terminated Andrews. Andrews met with Pressley, Davis, and Tim Austel, Pryor Giggey's Research Manager, in Pressley's office. Davis told Andrews he did not seem happy with his job and was being let go. (Doc. 32, 7, ¶ 18; Doc. 38, 13, ¶¶ 31-32).

After the meeting, Pressley came to Andrews and said "I told you I was going to get your black ass, I got you fired again, but you ain't coming back this time." Pressley filled out and

6

signed the Pryor Giggey termination paperwork for Andrews. (Doc. 32, 7-8, ¶ 19; Doc. 38, 13, ¶¶ 33-34).

Andrews' termination notice lists the *final* circumstance leading to his separation as "negative attitude, not working well with other employees, not willing to do what other employees are asked to do, causes disruption in every area we put him in, never wants to work over if needed, does not fit in what we need to maintain production at Pryor Giggey." (Doc. 38, 13, ¶ 36).

Andrews never received any written reprimands before his termination for the issues listed as the final circumstances leading to his termination. In fact, Woods, Andrews' immediate supervisor, said that Andrews "got along with everybody in the plant," never caused disruption, and was a good worker. Further, Pressley, when explaining the reasons for terminating Andrews, stated that Andrews' refusal to work overtime actually had *nothing* to do with Andrews' termination. (Doc. 38, 14, ¶¶ 37-40).

In contrast, Woods received a written warning in May, 2012 for issues including "his substandard performance," "his uncooperative nature," and his "refusal to be responsible." Woods never complained of racial discrimination and has not been terminated though Pryor Giggey has demoted Woods since Andrews' termination. (Doc. 33-8, 6; Doc. 38, 14-15, ¶¶ 41, 44).

Andrews' termination notice lists "complaining to management constantly" as an *additional* circumstance taken into consideration. Pressley explained that this statement referred to Andrews' complaints to Davis. (Doc. 38, 15, ¶¶ 45, 47).

Robert Hall, a Caucasian Pryor Giggey employee, filled Andrews position as Shipping

and Receiving Assistant. Pressley is now a lab technician and no longer supervises any other employees. (Doc. 38, 7, 20, ¶¶ 20, 75-76).

### H.    Lawsuit

Andrews filed a charge of discrimination with the Equal Employment Opportunity Commission on July 6, 2012. Andrews then filed a complaint with this court on May 3, 2013 alleging Pryor Giggey violated 42 U.S.C. § 2000e *et seq* ("Title VII") and 42 U.S.C. § 1981. His complaint contained three counts: (1) Racially Hostile Work Environment; (2) Retaliation; and (3) Race Discrimination. (Doc. 1). Pryor Giggey moved for summary judgment on March 24, 2014. (Doc. 1; Doc. 31).

### II.    Standard of Review

Summary judgment is an integral part of the Federal Rules of Civil Procedure. Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).

Once the moving party meets its burden of showing the district court that no genuine

issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254; *see Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013). The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *See Anderson*, 477 U.S. at 255.

Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. After both parties have addressed the motion for summary judgment, the court must grant the motion *only if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

9

### III.     Analysis

### A.     Hostile Work Environment

Pryor Giggey argues that Andrews' hostile work environment claim fails because no genuine issues of material fact exist and Pryor Giggey is not liable for Pressley's harassment as a matter of law. The court disagrees.

To establish a hostile work environment claim under Title VII and § 1981,[2] Andrews must show:

> (1) that [he] belongs to a protected group; (2) that [he] has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic . . .; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008).

Andrews clearly has shown, first, that as an African American, he is a member of a protected group; second, that Pressley's use of racial slurs "almost every other day" subjected Andrews to unwelcome racial harassment; and third, that race, a protected characteristic, was the basis for Pressley's harassment. Further, Pryor Giggey admits Andrews' "most recent testimony regarding the frequency of the alleged slurs may be enough to raise a genuine issue of fact on [the fourth element,] the severe and pervasive prong." (Doc. 32, 9).

Instead, only the fifth element, whether Andrews has shown that Pryor Giggey is liable

---

[2]Title VII and § 1981 "have the same requirements of proof and use the same analytical framework, therefore [the court] shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

for the hostile environment created by Pressley's harassment, is disputed. Pryor Giggey may be either *directly* or *vicariously* liable. Pryor Giggey is directly liable if Andrews' co-worker creates a hostile work environment and Pryor Giggey "was negligent with respect to the offensive behavior." *Vance v. Ball State Univ.*, --- U.S. ---, 133 S. Ct. 2434, 2441 (2013).

However, "different rules apply where the harassing employee is the plaintiff's 'supervisor,'" entitling the plaintiff to argue that the employer is vicariously liable. *Vance*, 133 S. Ct. 2441. "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Id*. A "tangible employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 2442. Pressley was the first person in the chain of command above Andrews who could hire, fire, and discipline employees. Pressley qualifies as Andrews' supervisor.

Pryor Giggey may be found vicariously liable for the conduct of Pressley, Andrews' supervisor, in two ways. First, if Pressley's harassment "culminates in a tangible employment action, [Pryor Giggey] is strictly liable." *Vance*, 133 S. Ct. at 2439. Essentially, the tangible employment action theory of liability asks whether *Pressley took* a tangible employment action against Andrews.

Second, even if Pressley did not take a tangible employment action against Andrews, Pryor Giggey is still vicariously liable for Pressley's conduct unless it affirmatively shows that "(1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective

11

opportunities that the employer provided." *Vance*, 133 S. Ct. 2439. Essentially, the hostile work environment theory of liability asks whether Pryor Giggey created an adequate remedy for any supervisor harassment that did not culminate in a tangible employment action.

### 1.    Tangible Employment Action

"To recover under the 'tangible employment action' theory of . . . harassment, the plaintiff must prove a causal link between the tangible employment action and the incident(s) of . . . harassment." *Arnold v. Tuskegee Univ.*, 212 Fed. App'x 803, 807 (11th Cir. 2006). Thus, Andrews must show that Pressley's harassment caused Andrews' termination. Andrews may show the causal link by either showing that Pressley was the actual decisionmaker for his termination or that Pressley used Davis as his "cat's paw" to effectuate Andrews' termination.

### a.    Actual Decisionmaker

If Pressley was the actual decisionmaker for Andrews' termination, an inference exists that the termination occurred because of Pressley's harassment. *See Arnold*, 212 Fed. App'x at 807. Genuine issues of material fact exist whether Pressley was the actual decisionmaker for Andrews' termination because, taking the facts in the light most favorable to Andrews, a jury could find that Pressley decided to terminate Andrews.

First, Pressley told Andrews that *he* caused the termination rather than Davis. Mere minutes after Andrews' termination meeting, Pressley told Andrews "I told you I was going to get your black ass, *I got you fired* again, but you ain't coming back this time." Second, Pressley, not Davis, completed and signed Andrews' separation notice. Pressley listed the final and contributing circumstances for Andrews' termination on the separation notice and noted that Andrews had previous written warnings (all written by Pressley or at Pressley's direction).

12

Further, Davis' involvement in Andrews' termination is not dispositive because Davis may have effectively delegated the termination decision to Pressley. "If an employer does attempt to confine decisionmaking power to a small number of individuals, those individuals will have a limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee." *Vance*, 133 S. Ct. at 2452. "Under those circumstances, the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." *Id*.

### b.    Cat's Paw

Even if Pressley was not the actual decisionmaker, genuine issues of material fact exist whether he used Davis' authority to carry out his desire to terminate Andrews. Andrews may also show that Pressley's harassment caused his termination by "showing that the decisionmaker, without having independently evaluated the plaintiff's situation, acted in accordance with the harasser's wishes in taking the tangible employment action against the plaintiff." *Arnold*, 212 Fed. App'x at 808. Davis' rubber stamp on Pressley's wishes is insufficient to shield Pryor Giggey from liability. *See Fields v. Atlanta Indep. Sch. Sys.*, 916 F. Supp. 2d 1348, 1365 (11th Cir. 2013).

Pressley's input into Andrews' termination taints Davis' decision even if Pressley's input is but one of many factors. "[I]f a supervisor performs an act motivated by . . . animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *King v. Volunteers of Am., N. Ala., Inc.*, 502 Fed. App'x 823, 828 (11th Cir. 2012); *see Staub v. Proctor Hosp.*, 562 U.S. 411, 131 S. Ct. 1186, 1192 (2011) (noting that "it is common for injuries to have multiple

13

proximate causes").

For example, evidence that written reprimands came from the harassing supervisor is evidence that discriminatory animus proximately caused a termination. *See King*, 502 Fed. App'x at 828. Further, a harassing supervisor's statement that he is going to get a victim fired, coupled with "outrageous, daily statements derogating African-American employees, creates a material dispute as to whether the stated reason, and not [the plaintiff's] race, was the real reason for the termination." *Id*.

Here, Pressley told Andrews he planned to get him fired and then he engineered Andrews' termination. Davis relied on written warnings issued by Pressley to Andrews on April 5, 2011, April 11, 2011, and June 13, 2011 and a written warning issued by Woods to Andrews at Pressley's direction on May 5, 2012. Normally, Davis would not have even reviewed the May 5, 2012 warning, but Pressley sent it to Davis anyway. Pressley and Davis spoke about Andrews' termination before the termination meeting. Pressley sat next to Davis in Andrews' termination meeting. Pressley filled out and signed Andrews' separation notice. After the meeting, Pressley told Andrews "I told you I was going to get your black ass, I got you fired again, but you ain't coming back this time." Thus, genuine issues of material fact exist whether Pressley used Davis as his cat's paw.

### c.    Independent Justifications

Even if Pressley was the *de jure* or *de facto* decisionmaker for Andrews' termination, Pryor Giggey can defeat the inference that Pressley's harassment caused Andrews' termination if it shows independent justifications for Andrews' termination. *See Arnold*, 212 Fed. App'x at 808. "In order to rebut an independent, non-discriminatory justification for a tangible employment

14

action, [the plaintiff] must present concrete evidence in the form of specific facts showing that [the employer's] proffered reasons are pretextual." *Fields*, 916 F. Supp. 2d at 1366. Andrews must meet Pryor Giggey's stated reason "head on and rebut it" and cannot succeed by "quarreling with the wisdom of that reason." *Id.*

To show that any involvement by Pressley is irrelevant, Pryor Giggey proffers four non-discriminatory justifications for Andrews' termination: (1) Woods' written warning to Andrews on May 5, 2012; (2) violations of Pryor Giggey rules by Andrews in January 2012 witnessed by Davis; (3) comments from Thomas in May 2012 that Andrews' refused to work; and (4) comments from Williams in May 2012 that he would rather not work with Andrews.

Genuine issues of material fact exist whether Pryor Giggey's independent justifications for Andrews' termination are legitimate or pre-textual. First, Woods wrote the May 5, 2012 warning at Pressley's direction around the same time Andrews complained about Pressley to Davis. Tellingly, Williams, Andrews' partner in loading and checking the incorrect shipment that formed the basis for the warning, never complained about Pressley, and Woods did not write him up. Further, Davis would not have even seen this warning except that Pressley brought it to Davis' attention on May 23, 2012. No small stretch is required to imagine Pressley had an ulterior motive for ordering Andrews' to be disciplined and forwarding the warning to Davis.

Second, the rules violations by Andrews that Davis witnessed occurred almost six months before Andrews' termination and Pryor Giggey never disciplined Andrews for these infractions. Temporal proximity is evidence that the harassment caused the tangible employment action. *See Arnold*, 212 Fed. App'x at 808. The inverse is also true, a lack of temporal proximity between rules violations and termination without any intervening disciplinary action against the employee

15

shows the violations did not cause the termination. In fact, Andrews received a merit pay raise between the infractions and his termination. This justification by Pryor Giggey begs the temporal question: If Davis observed Andrews breaking rules in January, why did he approve a raise and fail to fire him until June?

Third, Thomas' statements to Davis about Andrews' work ethic, which also occurred around the same time as Andrews' complaints about Pressley, is not an independent justification for terminating Andrews. Pressley engineered the meeting where Thomas and Davis discussed Andrews, tainting the independence of Thomas' statements. Further, Thomas rarely worked with Andrews (only three days in 2012), and Thomas' statements are counter-balanced by statements from Andrews' normal supervisor, Woods, who noted that everyone got along with Andrews.

Fourth, Davis' conversation with Williams is not an independent justification for terminating Andrews because the conversation is irrelevant. Williams told Davis he would rather not work with Andrews and "tried to avoid him," but denies that their conversation had anything to do with Andrews' job performance.

Genuine issues of material fact exist whether Pryor Giggey's justifications for terminating Andrews are truly independent given Pressley's heavy involvement in the termination decision. *See Staub*, 131 S. Ct. at 1194 ("But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.").

Thus, summary judgment is not appropriate because genuine issues of material fact exist whether Pressley's harassment caused Andrews' termination.

### 2.      Hostile Work Environment

Even if Pressley's harassment did not cause Andrews' termination, however, Pryor Giggey is still liable unless it affirmatively shows: (1) that Pryor Giggey exercised reasonable care to prevent and correct any harassing behavior; and (2) that Andrews unreasonably failed to take advantage of the preventive or corrective opportunities that Pryor Giggey provided. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 775 (1998) (establishing the *Faragher-Ellerth* defense); *see Burlington Indus. v. Ellerth*, 524 U.S. 742, 742 (1998) (establishing the *Faragher-Ellerth* defense).

The *Faragher-Ellerth* defense excuses the employer from liability when it acts reasonably to prevent and correct workplace harassment and the employee fails to take advantage of the preventative or corrective procedures offered by his employer. The point of the defense is to mitigate workplace harassment by encouraging companies to have policies in place to allow victims to report harassment to someone other than their supervisor.

### a.      Prevention and Correction Element

To satisfy the first element of the *Faragher-Ellerth* defense, Pryor Giggey must have exercised reasonable care to prevent and correct Pressley's harassment. "[T]he first element of the affirmative defense has two prongs:" prevention and correction. *Olson v. Lowe's Home Ctr. Inc.*, 130 Fed. App'x 380, 389 (11th Cir. 2005).

Generally, the prevention prong is satisfied if the employer has a "clear and published policy that outlines the procedures an employee must follow to report suspected harassment." *Blackmon v. Wal-Mart Stores E., L.P.*, 358 Fed. App'x 101, 103 (11th Cir. 2009). However, "an employer's showing that it has a . . . harassment policy does not automatically satisfy its burden."

17

*Frederick v. Sprint/United Mngt. Co.*, 246 F.3d 1305, 1314 (11th Cir. 2001).

Pryor Giggey argues it satisfied the prevention prong by publishing and distributing the Equal Opportunity Policy and the Harassment and Sexual Harassment Policy to Andrews. The Harassment and Sexual Harassment Policy requires employees to "promptly report the facts" of an incident to their supervisor or a company officer. In contrast, the Equal Opportunity Policy requires employees to report discrimination in writing to the Human Resources Department. Pryor Giggey also generally accepts oral complaints of discrimination.

Pryor Giggey's policy to prevent harassment is far from clear. One policy says Andrews should talk to his supervisor or a company officer; another policy says he should make a written complaint to the Human Resources Department, which the court is skeptical *even existed*. Davis even suggested Andrews could have made a complaint to "anyone." *See Frederick*, 246 F.3d at 1314-15 (finding genuine issues of material fact when multiple harassment policies and interpretations are in existence). Pryor Giggey has not met its burden to satisfy the prevention prong.

Even if it could satisfy the prevention prong, Prior Giggey cannot satisfy the correction prong. To satisfy the correction prong, Pryor Giggey must show that it took "substantive measures to stop the harassment and ensure that there is no reoccurrence." *Arnold*, 212 Fed. App'x at 809. Further, "an employer need not act instantaneously, but must act in a reasonably prompt manner to respond to the employee's complaint." *Frederick*, 246 F.3d at 1314.

Pryor Giggey argues it satisfied the correction prong by transferring Andrews to the Production area after he complained about Pressley's harassment. While Pryor Giggey acted promptly, it did not actually *respond* to Andrews' complaint.

18

Genuine issues of material fact exist whether Pryor Giggey merely moved Andrews to Production temporarily, as it had done before, before ultimately terminating him. This temporary transfer did not address or correct Andrews' complaint. Further, Pryor Giggey has not produced any evidence that it actually *investigated* Andrews' complaint. *See Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F. 3d 1287, 1303 (11th Cir. 2007) ("A threshold step in correcting harassment is to determine if any occurred, and that requires an investigation that is reasonable given the circumstances."). Pryor Giggey has not met its burden to satisfy the correction prong.

**b.      Avoidance Element**

To satisfy the second element of the *Faragher-Ellerth* defense, Pryor Giggey must show that Andrews failed to complain of Pressley's harassment to the appropriate person and his complaints failed to put Pryor Giggey on notice of the harassment. *See Olson*, 130 Fed. App'x at 389. However, Andrews complained to the appropriate person when he spoke with Davis in May 2012 because Davis is a company officer and because Pryor Giggey accepted complaints to "anyone." Further, Andrews complaint adequately notified Pryor Giggey of Pressley's harassment. Andrews told Davis: "I went in and Mr. Davis spoke and I told him I had a problem, a problem with Shane [Pressley] calling me the N-word."

Pryor Giggey argues that Andrews' delay in reporting Pressley's harassment means that Andrews did not take advantage of Pryor Giggey's efforts to cure the harassment. Pressley used racial slurs towards Andrews almost every other day beginning in June or July 2010, but Andrews failed to report the harassment to Davis until May 2012. However, an employee's delay in reporting harassment may be reasonable if the reporting procedure is unclear or if the employee's superiors tell the employee not to pursue complaints. *See Frederick*, 246 F.3d at

1316.

Here, genuine issues of material fact exist whether Andrews' delay is reasonable. First, Andrews may not have known where to report discrimination given Pryor Giggey's conflicting policies. Second, Pressley confirmed Andrews' fear that complaints were meaningless, stating "I told your black ass it wasn't going to do no good to go and tell Allen nothing on me. Allen can't fire me."

Therefore, Pryor Giggey fails the avoidance element of the *Faragher-Ellerth* defense. Because Pryor Giggey failed to affirmatively establish either element of the *Faragher-Ellerth* defense, Andrews' hostile work environment theory survives summary judgment.

In summary, Andrews' hostile work environment claim survives summary judgment. Genuine issues of material fact exist whether Pressley's harassment caused Andrews' termination and, even if Pressley's harassment is not connected to Andrews' termination, genuine issues of material fact exist whether Pryor Giggey adequately prevented and corrected Pressley's harassment and whether Andrews' failed to take advantage of Pryor Giggey's preventative and corrective measures. Thus, this claim remains for the jury.

**B.    Termination Claims**

Pryor Giggey next argues that Andrews' retaliatory discharge and discriminatory discharge claims fail because Andrews cannot prove that his race or his complaints to Davis about Pressley's racial harassment caused his termination. The court disagrees.

**1.    *Prima Facie* Case of Retaliatory Discharge**

To prove a claim of retaliatory discharge under Title VII and § 1981, Andrews must first establish a *prima facie* case that "(1) [he] engaged in statutorily protected expression; (2) [he]

suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir.1998). Here, Pryor Giggey only challenges the third element, arguing that Andrews' complaint to Davis about Pressley's harassment was not the "but-for" cause of his termination. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, --- U.S. ---, 133 S. Ct. 2517, 2533 (2013) (requiring but-for causation)

Genuine issues of material fact exist whether Andrews' complaint to Davis was the but-for cause of his termination. First, Andrews' termination, coming mere weeks after his complaints to Davis, is strong circumstantial evidence that create jury questions of whether the complaints caused the termination. *See Brungart v. BellSouth Telecom., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (finding "[t]he general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection," especially when the decisionmaker knew about the protected conduct).

Second, *the same day* that Andrews complained to Davis, Pressley told Andrews: "I told your black ass it wasn't going to do not good to go and tell Allen nothing on me. Allen can't fire me." Pressley followed up on his threat the day Pryor Giggey terminated Andrews, stating "I told you I was going to get your black ass, I got you fired again, but you ain't coming back this time."

Third, Andrews' termination notice lists "complaining to management constantly" as a factor in his termination. This evidence, coupled with temporal proximity and Pressley's statements to Andrews, is sufficient to create a genuine issue of material fact whether Andrews' complaint caused his termination.

Andrews has presented sufficient evidence to support a *prima facie* case of retaliatory

discharge.

### 2.     *Prima Facie* **Case of Discriminatory Discharge**

To prove a claim of discriminatory discharge under Title VII and § 1981, Andrews must first establish a *prima facie* case that (1) he is a member of a protected class; (2) he was qualified for the job he held; (3) he suffered an adverse employment action; and (4) he was replaced by someone outside his protected class or that similarly situated employees outside his protected class received more favorable treatment. *See Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002).

Pryor Giggey only challenges the fourth element of Andrews' *prima facie* case and argues that Andrews cannot show that someone outside his protected class replaced him because Pryor Giggey reassigned Andrews' job duties to both African American and Caucasian employees. However, as Andrews succinctly stated, "A reasonable jury could conclude otherwise, as every current employee of [Pryor Giggey] testified that after [Andrews] was terminated, his position of Shipping and Receiving Assistant was filled by Robert Hall, who is white." (Doc. 38, 31).

Further, genuine issues of material fact exist whether Andrews and his comparator, Robert Hall, are similarly situated. Pryor Giggey points out that Andrews produced no evidence that Hall engaged in "nearly identical misconduct" to Andrews including Andrews' "inability to work with other employees." (Doc. 32, 21). "The problem for [Pryor Giggey] is that this evidence is disputed by [Andrews] with other evidence." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004). According to Woods, Andrews "got along with everybody in the plant," never caused disruption, and was a good worker.

Andrews has presented sufficient evidence to support a *prima facie* case of discriminatory

discharge.

### 3.     Pretext

Finally, Pryor Giggey argues that Andrews' retaliatory discharge and discriminatory discharge claims fail because Davis had independent justifications for terminating Andrews. The court disagrees.

Once Andrews has established the *prima facie* case, Pryor Giggey must "articulate a legitimate, nondiscriminatory reason for the adverse action." *Scott*, 295 F.3d at 1228. Once Pryor Giggey has done so, Andrews must show that Pryor Giggey's "proffered reason is merely pretext for discrimination." *Id*.

As discussed above in section III.A.1.c regarding Andrews' hostile work environment claim, genuine issues of material fact exist whether Pryor Giggey's independent justifications are mere pretext, especially given Pressley's involvement in Andrews' termination.

Pryor Giggey argues that Pressley never made a formal "recommendation" that Andrews be terminated or took any action intended to cause Andrews to be terminated. Taking the facts in the light most favorable to Andrews, however, a jury could find otherwise. Pressley inextricably bound himself up with Andrews' termination. Pressley wrote the reports Davis read before terminating Andrews; Pressley talked to Davis about Andrews; Pressley attended Andrews' termination meeting; Pressley wrote out Andrews' separation notice and listed (and could explain) the reasons for Andrews termination; and, finally, Pressley told Andrews "I got you fired" after the termination meeting.

In summary, Andrews has presented sufficient evidence to support a *prima facie* case of retaliatory discharge and discriminatory discharge for purposes of summary judgment and

genuine issues of material fact exist whether Pryor Giggey's justifications for Andrews'
termination are mere pretext. Thus, these claims remain for the jury.

### IV.    Conclusion

Andrews' claims survive summary judgment. Taking the facts in the light most favorable
to Andrews, a jury could find that Pressley harassed Andrews by using racial slurs "almost every
other day." After months of mistreatment, Andrews finally figured out what he was supposed to
do – tell Davis about Pressley's behavior. Andrews finally got the nerve to tell Davis about
Pressley's behavior and, a few hours later, Pressley erupts, threatening to get Andrews fired.

Over the next few weeks, Pressley orchestrates Andrews' termination, pressuring those
below him in the chain of command to disparage Andrews, selectively forwarding negative
information to Davis about Andrews, discussing Andrews' performance with Davis, and, finally,
sitting next to Davis at Andrews' termination meeting and literally signing off on Andrews'
termination. Never one to be shy, Pressley then *brags* to Andrews "I told you I was going to get
your black ass, I got you fired again, but you ain't coming back this time."

The court cannot grant summary judgment on these facts. A jury could find that Andrews
suffered from a racially hostile work environment and that Pryor Giggey terminated Andrews
because of his race and because he complained about racial harassment.

Therefore, the court **DENIES** Pryor Giggey's motion for summary judgment.

**DONE** and **ORDERED** this 16th day of January, 2015.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE